## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **SVV TECHNOLOGY INNOVATIONS INC.** | § § § | |
| *Plaintiff*, | § § | **Civil Action No.  6:24-cv-539** |
| **v.** | § § | **JURY DEMANDED** |
| **ACER INC.** | § § | |
| *Defendant*. | § § | |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SVV Technology Innovations Inc. ("SVVTI" or "Plaintiff") files this First Amended Complaint for patent infringement against Acer Inc. ("Acer" or "Defendant").  Plaintiff alleges infringement of United States Patent Numbers 8,290,318 ("'318 Patent"); 10,439,088 ("'088 Patent"); 10,627,562 ("'562 Patent"); 10,838,135 ("'135 Patent"); and RE49630 ("'630 Patent"); collectively, the "Asserted Patents."

## RELATEDNESS TO OTHER CASES

1.      This action is related to other actions considered by the District Court for the Western District of Texas, Waco Division, under Judge Alan D. Albright. Specifically, SVVTI asserted the '318 Patent, '088 Patent, '562 Patent, and '135 Patent in other actions that it had previously filed in in the Waco Division, and the Waco Division Court had construed claims of those patents. The Waco Division Court had also considered numerous motions, including discovery motions and dispositive motions, and resolved disputes between parties relating to the technology at issue in these patents.

The following is a list of SVVTI actions involving the '318 Patent considered by the Waco

Division Court:

- *SVV Technology Innovations, Inc. v. ASUSTeK Computer Inc.*, No. 6:22-cv-311-ADA (**through jury trial**, currently pending)
- *SVV Technology Innovations, Inc. v. Acer Inc.*, No. 6:22-cv-639-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Micro-Star International Co., Ltd.*, No. 6:22-cv-511-ADA (through claim construction)

The following is a list of SVVTI actions involving the '088 Patent considered by the Waco

Division Court:

- *SVV Technology Innovations, Inc. v. ASUSTeK Computer Inc.*, No. 6:22-cv-313-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Acer Inc.*, No. 6:22-cv-641-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Micro-Star International Co., Ltd.*, No. 6:22-cv-513-ADA (through claim construction)

The following is a list of SVVTI actions involving the '562 Patent considered by the Waco

Division Court:

- *SVV Technology Innovations, Inc. v. ASUSTeK Computer Inc.*, No. 6:22-cv-311-ADA (**through jury trial**, currently pending)
- *SVV Technology Innovations, Inc. v. Acer Inc.*, No. 6:22-cv-639-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Micro-Star International Co., Ltd.*, No. 6:22-cv-511-ADA (through claim construction)

The following is a list of SVVTI actions involving the '135 Patent considered by the Waco

Division Court:

- *SVV Technology Innovations, Inc. v. ASUSTeK Computer Inc.*, No. 6:22-cv-312-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Acer Inc.*, No. 6:22-cv-640-ADA (**through jury trial**, currently pending)
- *SVV Technology Innovations, Inc. v. Micro-Star International Co., Ltd.*, No. 6:22-cv-512-ADA (through claim construction)

## PARTIES

2.      Plaintiff SVVTI is a California corporation with a place of business 1832 Tribute Road, Suite C, Sacramento, California 95815.

3.      On information and belief, Acer Inc. is a corporation organized and existing under the laws of Taiwan with a principal place of business at 8F., No.88, Sec. 1, Xintai 5th Rd., Xizhi Dist., New Taipei City 221, Taiwan, R.O.C.

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.  Jurisdiction as to these claims is conferred on this Court by 35 U.S.C. §§1331 and 1338(a).

5.      This Court has personal jurisdiction over Acer because, directly or through intermediaries, each has committed acts within the Western District of Texas giving rise to this action and/or has established minimum contacts with the Western District of Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

6.      Acer has placed or contributed to placing infringing products into the stream of commerce via an established distribution channel knowing or understanding that such products would be sold and used in the United States, including in the Western District of Texas.

7.      This Court has specific personal jurisdiction over Acer at least in part because Acer conducts business in this Judicial District. SVVTI's causes of action arise, at least in part, from Defendant's contacts with and activities in the State of Texas and this Judicial District. The exercise of jurisdiction over Acer would not offend traditional notions of fair play and substantial justice. Defendant Acer, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement

in this District by, among other things, offering to sell and selling products and/or services that infringe the patents-in-suit, including the accused devices as alleged herein.

8.      On information and belief, Acer also has derived substantial revenues from infringing acts in this Judicial District, including from the sale and use of infringing products including, but not limited to, the products accused of infringement below.

9.      On information and belief, Acer maintains authorized sellers and sales representatives that offer and sell products pertinent to this Complaint throughout the State of Texas, including this District and to consumers throughout this District.

10.     Defendant has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

11.     Venue in this Judicial District is proper as to Acer under 28 U.S.C. § 1391(c)(3) because it is a foreign corporation.  Defendant has committed acts within this judicial district giving rise to this action, and Defendant continues to conduct business in this judicial district, including one or more acts of selling, using, importing and/or offering for sale infringing products or providing service and support to Defendant's customers in this District. This district is familiar with the technology of the Patents-in-Suit having presided over another lawsuit involving the Patents-in-Suit.

12.     In addition, Defendant has knowingly induced and continues to knowingly induce infringement within this District by advertising, marketing, offering for sale and/or selling devices pre-loaded with infringing functionality within this District, to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user

manuals, advertising, and/or marketing materials which facilitate, direct or encourage the use of infringing functionality with knowledge thereof.

13.     Personal jurisdiction also exists specifically over Defendant because Defendant, directly or through affiliates, subsidiaries, agents, or intermediaries, transacts business in this State or purposefully directed at this State (including, without limitation, retail stores including Best Buy and Walmart) by making, importing, offering to sell, selling, and/or having sold infringing products within this State and District or purposefully directed at this State or District.

14.     In addition, Defendant, directly or through affiliates, subsidiaries, agents, or intermediaries, places infringing products into the stream of commerce knowing they will be sold and used in Texas, and economically benefits from the retail sale of infringing products in this State. For example, Defendant's products have been sold and are available for sale in this District at Best Buy and Walmart retail stores and are also available for sale and offered for sale in this District through online retailers such as Best Buy, Walmart, and Amazon.

15.     Via Defendant's agents, intermediaries, distributors, importers, customers, and/or consumers maintaining a business presence, operating in, and/or residing in the U.S., Defendant's products, including products and processes accused of infringing the patents-in-suit, are or have been widely distributed and sold in retail stores, both brick and mortar and online, in Texas including within this judicial district. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-cv-00197-JRG, 2019 WL 1979930, at *3 (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss because plaintiff sufficiently plead that purchases of infringing products outside of the United States for importation into and sales to end users in the U.S. may constitute an offer to

sell under § 271(a)). For example, Defendant's products are sold to end users by online stores and at retail stores located throughout the Western District of Texas.

16.    In the alternative, the Court has personal jurisdiction over Defendant under Fed. R. Civ. P. 4(k)(2), because the claims for patent infringement in this action arise under federal law, Defendant is not subject to the jurisdiction of the courts of general jurisdiction of any state, and exercising jurisdiction over Defendant is consistent with the U.S. Constitution.

## FACTUAL BACKGROUND

17.    SVVTI was founded in 2000 by Dr. Sergiy Vasylyev, a scientist and prolific inventor.

18.    Dr. Sergiy Vasylyev has an academic background and more than 20 years of research experience in physical sciences. He received an M.S. equivalent in Physics and Astronomy from the Kharkiv State University, Ukraine in 1992 and a Ph.D. in Physics and Mathematics from the Main Astronomical Observatory of National Academy of Sciences of Ukraine in 1996. From 1996 to 1999, he worked with several major academic research institutions and was involved in diverse research projects in the areas of space physics and solar energy. After immigrating to the U.S., in 2000, Dr. Vasylyev founded SVV Technology Innovations, Inc. to develop and commercialize his ideas in several technical fields ranging from optics and information technology to solar energy and lighting. Dr. Vasylyev is the author of approximately eighty patents and dozens of patent applications, has had numerous talks and presentations at the national and international conferences related to space physics, solar energy and lighting and has authored/co-authored over 30 scientific and technical publications. Dr. Vasylyev's broad technical expertise areas include IT/IOT, optics, photonics, lightguide-based illumination systems, solar energy, daylighting, and solid-state lighting.

19.    Since its inception, SVVTI has been a vehicle for developing and commercializing Dr. Vasylyev's inventions, particularly being dedicated to creating impactful technology solutions that find utility in energy efficiency, renewable energy and certain types consumer products. One technology focus is optical advances that enhance solar energy harvesting and save energy in illumination systems.

20.    SVVTI has invented and validated several ground-breaking technology solutions and has accumulated an extensive knowledge and built a diverse IP portfolio in optics, photonics, solar energy, daylighting and solid-state lighting fields. SVVTI has received innovation awards from TechConnect, Cleantech Open, and Illuminating Engineering Society.

21.    SVVTI has developed and demonstrated several novel types of optical collectors for solar energy applications, significantly improving over the traditional technologies in terms of material intensity, concentration ratio, beam uniformity and solar-to-electric conversion efficiency.

22.    Another notable technology developed by SVVTI is a unique daylight redirecting film material (Daylighting Fabric®) which is applied to windows of a building façade to redirect natural daylight deep into the interior space for improving natural illumination and saving energy used for lighting.

23.    SVVTI has also developed and demonstrated various types of innovative wide-area illumination panels and backlights employing light guides and light emitting diodes (LEDs). These panels can be tailored for specific applications and improving various characteristics of illumination systems, including, for example, light beam diffusion, emission directionality, material efficiency, luminous efficacy, glare control, design options and aesthetics.

24.     On or about, January 29, 2021, Acer received a letter from SVVTI, dated January 22, 2021, introducing SVVTI, and notifying Acer of several of the patents identified below, and identifying several of Acer's products that utilize SVVTI's intellectual property.  In particular, the January 22, 2021 letter identified United States Patent Nos. 8,290,318; 8,740,397; 9,678,321; 9,097,826; 9,256,007; 9,880,342; 10,269,999; 10,439,088; 10,439,089; 10,613,306; 10,627,562; 10,797,191; 10,838,135; and 10,868,205.

25.     Defendant has been aware of the '318 Patent, '088 Patent, '562 Patent, and '135 Patent since, at least, June 21, 2021 when SVVTI filed three patent infringement lawsuits against Acer, styled *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-639-ADA (W.D. Tex.), *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-640-ADA (W.D. Tex.), and *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-641-ADA (W.D. Tex.).  Those cases collectively accused Acer of infringement the '318 Patent, '088 Patent, '562 Patent, and '135 Patent.

26.     Defendant has been aware of the Asserted Patents since, at least, the filing and/or service of the original complaint in this case.

## TECHNOLOGY BACKGROUND

27.     Several of the products accused of infringement below are products that contain displays using LED-illuminated LCD technology.  A LED-illuminated LCD (liquid-crystal display) is a flat-panel display that uses LED (light-emitting diode) illumination.  The illumination may come from LEDs along one or more sides of the display (edge-lit) or from full-array backlighting (direct-lit).  As explained below, some displays use a quantum dot enhancement film ("QDEF").

28.    Some of the monitors sold by Acer are QLED monitors.  QLED stands for quantum dot LED.  Acer sells monitors that use QLED technology and heavily markets them to the gaming community.  Generally, quantum dots are small, semiconductor particles that have unique optical and electronic properties, including the ability to produce pure monochromatic red, green, and/or blue light.

29.    A widespread commercial application is using a quantum dot enhancement film ("QDEF") layer to improve the LED backlighting in LCD displays. In this application, light from a blue LED backlight is converted by quantum dots to relatively pure red and green. This combination of blue, green and red light incurs less blue-green crosstalk and light absorption in the color filters after the LCD screen, thereby increasing useful light throughput and providing a better color gamut.  The QDEF layer is able to replace a diffuser used in traditional LCD backlight units.

30.    The use of quantum dots to produce monochromatic red, green and blue light is an improvement over traditional LCD backlight units which fed a blue LED through a yellow filter to create white light which was then passed through red, green and blue color filters.

## COUNT I

## DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 8,290,318

31.    On October 16, 2012, United States Patent No. 8,290,318 entitled "Light Trapping Optical Cover" was duly and legally issued after full and fair examination.  SVVTI is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income.  A true copy of the '318 patent is

incorporated by reference herein and may be accessed at

https://patents.google.com/patent/US8290318B2.

32.     The following products are accused of infringing the '318 Patent (the "'318

Accused Products"):

Acer XV273K Pbmiipprzx.

In addition, the '318 Accused Products shall include those products identified in SVVTI's

infringement contentions, to be served in accordance with the case scheduling order.

33.     Defendant has directly infringed, and is continuing to directly infringe, literally or

under the doctrine of equivalents, at least claims 1, 2, 3, 5, 6, 8, 11, 13, 14, and 15 of the '318

patent by importing into the United States, making, using, selling, and/or offering for sale, at

least, the '318 Accused Products, including computer monitors and laptops in the United States,

in violation of 35 U.S.C. § 271(a).

34.     Alternatively, and in addition, Defendant directly infringes as described in the

preceding paragraph, by making and selling the '318 Accused Products outside of the United

States, delivers those products to its customers, distributors, and/or subsidiaries in the United

States, or in the case that it delivers the Accused Products outside of the United States it does so

intending and/or knowing that those products are destined for the United States and/or designing

those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee

Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex.

2013). Furthermore, Defendant directly infringes through its direct involvement in the activities

of its distributors or subsidiaries, including by selling and offering for sale the '318 Accused

Products directly to is distributors or subsidiaries and importing the '318 Accused Products into

the United States. Upon information and belief, Defendant conducts activities that constitutes

direct infringement. Defendant is vicariously liable for this infringing conduct of its distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

35.     In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '318 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '318 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to import in violation of § 271(g)), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '318 Accused Products, creating established distribution channels for the '318 Accused Products into and within the United States, manufacturing the '318 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

36.     The '318 Accused Products use an optical cover, specifically, an LCD display. The LCD display has a backlight including various light-management optical sheets (including,

for example, a light guiding plate (LGP)) within a backlighting/LCD panel assembly. The LCD/backlighting panel assembly includes a layer of optically transparent material (LGP). The LGP is formed by a plastic sheet made from a highly transparent material (such as optical-grade acrylic). The LGP includes two opposing broad-area surfaces extending parallel to each other. The LGP (layer of optically transparent material) contains a large number of light-deflecting elements (microstructures). These light deflecting elements are formed in the back surface of the LGP and distributed along the prevailing plane of the LGP. Both the front and back surfaces of the LGP receive light and therefore are input surfaces. Furthermore, both of the surfaces are characterized by a stepped drop in refractive index outwardly from the respective layer (LGP) and by a critical angle of a Total Internal Reflection (the LGP guides light emitted by the LEDs using Total Internal Reflection). Each of the light deflecting elements (microstructures) receive light that propagate between the opposing front and back surfaces (e.g., the light that is recycled within the LCD/backlighting panel assembly and passed through the LGP. To the extent light harvesting is required by a dependent claim limitation, the display includes a quantum dot film. Quantum dot materials are used to absorb blue light emitted from the backlight and re-emit the absorbed energy in other spectral bands1 of light (e.g., red and/or green colors).

## COUNT II

## DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 10,439,088

37. On October 8, 2019, United States Patent No. 10,439,088 entitled "Light Converting System Employing Planar Light Trapping and Light Absorbing Structures" was duly and legally issued after full and fair examination. SVVTI is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future

royalties, damages, and income.  A true copy of the '088 patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US10439088B2.

38.     The following products are accused of infringing the '088 Patent (the "'088 Accused Products"):

Acer XV273K Pbmiipprzx.

In addition, the '088 Accused Products shall include those products identified in SVVTI's infringement contentions, to be served in accordance with the case scheduling order.

39.     Defendant has directly infringed, and is continuing to directly infringe, literally or under the doctrine of equivalents, at least claims 1-3, 5, 7-13, 16, 18-24, 25, and 26 of the '088 patent by importing into the United States, making, using, selling, and/or offering for sale, at least, '088 Accused Products including computer monitors and laptops in the United States, in violation of 35 U.S.C. § 271(a).

40.     Alternatively, and in addition, Defendant directly infringes as described in the preceding paragraph, by making and selling the '088 Accused Products outside of the United States, delivering those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the '088 Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Defendant directly infringes through its direct involvement in the activities of its distributors or subsidiaries, including by selling and offering for sale the Accused Products directly to is distributors or subsidiaries and importing the Accused Products into the United States. Upon information and belief, Defendant conducts activities that constitutes direct

infringement. Defendant is vicariously liable for this infringing conduct of its distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

41.     In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '088 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '088 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to import in violation of § 271(g)), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '088 Accused Products, creating established distribution channels for the '088 Accused Products into and within the United States, manufacturing the '088 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

42.     The '088 Accused Products use a light converting optical system, specifically, an LCD display. The LCD display incorporates a liquid crystal display (LCD) which is backlit

using a backlighting assembly (backlight). The backlight uses multiple light-emitting diodes (LEDs) which are placed along an edge of the visible area of the display and provide a light source. The LEDs emit blue light, a portion of which is absorbed and converted to other wavelengths within the backlight.  The LCD/backlighting assembly of the display contains LEDs that are used as a light source. The LEDs are a monochromatic (e.g., emitting light only in one color) light source which is configured to emit light in a preselected spectral range (the LEDs emit light in blue color when powered on).  The LCD/backlighting assembly contains a planar lenticular lens array (an array of linear cylindrical lenses on a planar plastic substrate). The lens array is disposed in energy receiving relationship with respect to the light source (e.g., LEDs are shining light into an edge of the lens array) and is used to distribute light emitted by the LEDs. The LCD/backlighting assembly contains a microstructured surface (e.g., a surface having structures on a microscopic scale) including a plurality of linear grooves. For example, the LCD/backlighting assembly contains a composite prism sheet, also called brightness enhancement film (BEF). The front surface of the prism sheet has a regular prismatic pattern formed by microscopic linear grooves disposed side by side.  The LCD/backlighting assembly contains a reflective surface (back reflector) on a back side of the lens array.  The backlight contains a generally planar photoresponsive layer. For example, the backlight contains a Quantum Dot Enhancement Film (QDEF) which is retained in a planar form within the backlight and contains an active layer which is responsive to blue light emitted by the LEDs (e.g., by absorbing that light and converting it to red and green colors).  The photoresponsive layer comprises a semiconductor material in the form of quantum dots. For example, QDEF incorporates quantum dots2 which are nano-sized crystals made of semiconductor materials. The quantum dots are embedded into an optically transmissive material. For example, the

quantum dots are embedded into the active layer of QDEF which is formed from a material that transmits light.  The thickness of the photoresponsive layer is less than a minimum thickness sufficient for absorbing substantially all received light in a single pass at normal incidence.  For example, QDEF transmits at least some light without absorption in a single pass.

## COUNT III

### DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 10,627,562

43.     On April 21, 2020, United States Patent No. 10,627,562 entitled "Illumination System Using Edge-Lit Waveguide and Microstructured Surfaces" was duly and legally issued after full and fair examination.  SVVTI is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income.  A true copy of the '562 patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US10627562B2.

44.     The following products are accused of infringing the '562 Patent (the "'562 Accused Products"):

> Acer EK240Q bi, Acer EK241Y, Acer QG271 bi, Acer ED270 Xbmiipx, Acer ED270U P2bmiipx, Acer Iconia Tab P10 Model 22001, Acer B247Y Ebmiprx, Acer SB272 bi, Acer QG271 Ebii, Acer SB272 Ebi.

In addition, the '562 Accused Products shall include those products identified in SVVTI's infringement contentions, to be served in accordance with the case scheduling order.

45.     Defendant has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 2, 4-8, 10, 13, 14-18, and 19-20 of the '562

patent by importing into the United States, making, using, selling, and/or offering for sale, at least, the '562 Accused Products, in the United States, in violation of 35 U.S.C. § 271(a).

46.     Alternatively, and in addition, Defendant directly infringes as described in the preceding paragraph, by making and selling the '562 Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the '562 Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Defendant directly infringes through its direct involvement in the activities of its distributors or subsidiaries, including by selling and offering for sale the '562 Accused Products directly to is distributors or subsidiaries and importing the '562 Accused Products into the United States. Upon information and belief, Defendant conducts activities that constitutes direct infringement. Defendant is vicariously liable for this infringing conduct of its distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

47.     In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '562 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing

the '562 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to import in violation of § 271(g)), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '562 Accused Products, creating established distribution channels for the '562 Accused Products into and within the United States, manufacturing the '562 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

48.     The '562 Accused Products use an edge-lit waveguide illumination system, specifically, an LCD display. The LCD display incorporates a liquid crystal display (LCD) which is backlit using a backlighting panel assembly (backlight). The backlight uses multiple light-emitting diodes (LEDs) which are placed along an edge of the visible area of the display and provide a light source. Light emitted by the LEDs is redistributed within the backlight using an optical waveguide.  The display incorporates a thin planar body of an optically transmissive material having edges disposed between a first broad-area surface and an opposing second broad-area surface. For example, the backlight of the display contains a large-area light guiding plate (LGP) which is 3 mm in thickness and which transmits light. The LGP has edges disposed between its front surface and opposing back surface. Both the front and back surfaces have broad areas (e.g., extending along approximately the entire length and width of the visible portion of the display).  The display also incorporates a plurality of light emitting diodes (LEDs) optically

coupled to an edge of said optically transmissive material (LGP). For example, multiple LEDs are positioned along and oriented towards a light input edge of LGP such that the edge is illuminated when LEDs are turned on. The display incorporates a plurality of linear lenses formed in said first broad-area surface (front surface of LGP). For example, the front surface of LGP has a large number of long and narrow lenses which extend along straight lines between opposite edges of LGP. The display incorporates a plurality of surface relief features formed in said second broad-area surface (back surface of LGP) according to a predetermined two-dimensional pattern. For example, the back surface of LGP has a two-dimensional pattern of microstructures which are distributed over both length and width dimensions of the surface and are used to extract light from LGP. The two-dimensional pattern is predetermined (e.g., designed to make LGP to uniformly emit light from its surface). The optically transmissive material (LGP) is configured to receive light on said edge and propagate the received light towards an opposing edge in response to optical transmission and total internal reflection. For example, LGP receives light from LEDs on its light input edge and propagates it towards the opposite edge using optical transmission and total internal reflection (TIR)[3] from its front and back surfaces. The plurality of surface relief features (microstructures) is configured to extract light from said optically transmissive material (LGP) such that the extracted light is distributed from a surface of said plurality of linear lenses. For example, as explained above, the microstructures are used to extract light from LGP. The extracted light is distributed through the front surface of LGP, in which the linear lenses are formed, towards the front side of the display. Thus, the extracted light is distributed from the surface of linear lenses.

## **COUNT IV**

## **DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 10,838,135**

49.     On November 17, 2020, United States Patent No. 10,838,135 entitled "Edge-Lit Waveguide Illumination Systems Employing Planar Arrays of Linear Cylindrical Lenses" was duly and legally issued after full and fair examination.  SVVTI is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income.  A true copy of the '135 patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US10838135B2.

50.     The following products are accused of infringing the '135 Patent (the "'135 Accused Products"):

Acer EK240Q bi, Acer EK241Y, Acer QG271 bi, Acer ED270 Xbmiipx, Acer ED270U P2bmiipx, Acer Iconia Tab P10 Model 22001, Acer B247Y Ebmiprx, Acer SB272 bi, Acer QG271 Ebii, Acer SB272 Ebi.

In addition, the '135 Accused Products shall include those products identified in SVVTI's infringement contentions, to be served in accordance with the case scheduling order.

51.     Defendant has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 2, 5, 6, 8, 9, 11, 13, 16, 17 and 24 of the '135 patent by importing into the United States, making, using, selling, and/or offering for sale, at least, the '135 Accused Products, in the United States, in violation of 35 U.S.C. § 271(a). Defendant has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 19, 22 and 23 of the '135 patent by importing into the United States, at least, the '135 Accused Products, in violation of 35 U.S.C. § 271(g).

52.     Alternatively, and in addition, Defendant directly infringes as described in the preceding paragraph, by making and selling the '135 Accused Products outside of the United

States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the '135 Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Defendant directly infringes through its direct involvement in the activities of its distributors or subsidiaries, including by selling and offering for sale the '135 Accused Products directly to is distributors or subsidiaries and importing the '135 Accused Products into the United States. Upon information and belief, Defendant conducts activities that constitutes direct infringement. Defendant is vicariously liable for this infringing conduct of its distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

53.     In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '135 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '135 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to

import in violation of § 271(g)), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '135 Accused Products, creating established distribution channels for the '135 Accused Products into and within the United States, manufacturing the '135 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

54.    The '135 Accused Products use an edge-lit waveguide illumination system, specifically, an LCD display. The LCD display incorporates a liquid crystal display (LCD) which is backlit using a backlighting panel assembly (backlight). The backlight uses multiple light-emitting diodes (LEDs) which are placed along an edge of the visible area of the display and provide a light source. Light emitted by the LEDs is redistributed within the backlight using an optical waveguide which is the light guide plate (LGP). The edge-lit waveguide illumination system (display) comprises an optically transmissive plate having a flexible monolithic structure, a front surface, an opposing back surface extending parallel to the front surface, a first edge, a second edge extending parallel to the first edge, a third edge extending perpendicular to the first and second edges, and a fourth edge extending parallel to the third edge. For example, the backlight assembly incorporates a flexible light guide plate (LGP) which is an optically transmissive plate and has the shape of a rectangular sheet with front and back surfaces and four edges. The first edge is the light input edge where the LGP receives light. The distance between the first and second edges is at least 40 times greater than the thickness of the optically transmissive sheet, and the distance between the third and fourth edges is at least 20 times greater than the thickness of the optically transmissive plate. For example, the LGP has a

thickness of 3 mm, which is less than 20 times the width of the LGP and less than 40 times the length of LGP.   The display incorporates a plurality of light emitting diodes (LEDs) which are optically coupled to the first edge and configured to emit a divergent light beam towards the first edge. For example, LEDs are positioned along the light input edge of the LGP and configured to emit light towards the LGP.  The display also incorporates a lenticular array of linear cylindrical lenses formed in the front surface and extending along straight parallel lines between two opposing edges of the optically transmissive plate.  For example, the front surface of the optically transmissive plate (LGP) contains an array of linear cylindrical lenses.  Each of the cylindrical lenses of the front surface has the shape of a section cylinder, and the ridges are parallel to each other and form a regular pattern in the front surface of the optically transmissive plate.  The display also incorporates a plurality of discrete light extracting surface relief features formed in the back surface of the optically transmissive plate (LGP) according to a two-dimensional pattern such that each of the plurality of the discrete light extracting surface relief features are separated from one another and from each of the first, second, third, and fourth edges by smooth and planar portions of the back surface.  For example, the back surface of the optically transmissive plate (LGP) contains a plurality of discrete light extracting surface relief features (microstructures). The microstructures contain cavities and protrusions. The microstructures are distributed over the back surface of the LGP according to a randomized two-dimensional pattern and are spaced apart from each other by non-textured planar portions.  The display also incorporates a reflective surface approximately coextensive with the optically transmissive plate and positioned on a back side of the optically transmissive plate. For example, the reflector is positioned below the back surface of the LGP.  The display incorporates several light diffusing layers approximately coextensive with the optically transmissive plate. The

diffusers are positioned above the front surface of the LGP. The optically transmissive plate (LGP) is configured to receive light on the first edge, guide the light received on the first edge towards the second edge using optical transmission and total internal reflection, and distribute the light received on the first edge from both the front and back surfaces towards divergent directions. For example, the optically transmissive plate (LGP) receives light from the LEDs on the optically transmissive plate's light input edge. The optically transmissive sheet guides the light received towards the second edge through optical transmission and application of principles of total internal reflection (TIR) mechanism, and distributes the light received towards divergent directions. The optically transmissive plate (LGP) is configured to receive light on the front surface and propagate the light towards the back surface. For example, a composite prism sheet is positioned above the front surface of the LGP and is configured to reflect some light towards the front surface of the LGP to be propagated towards the back surface of the LGP. The area occupied by each of the linear cylindrical lenses is substantially greater than an area occupied by each of the plurality of the discrete light extracting surface relief feature. The area of each light deflecting element (microstructure) is less than one tenth of a millimeter. The light receiving area (aperture) of each elongated cylindrical lens is at least several square millimeters or more. Thus, the area of each of the linear cylindrical lenses is substantially greater than an area occupied by each of the plurality of the discrete light extracting surface relief features. The plurality of discrete light extracting surface relief features is configured to disrupt total internal reflection at the back surface and extract at least some light propagated in the optically transmissive plate towards the reflective surface. For example, the microstructures disrupt the smooth, non-textured surface of the back surface and are specifically designed to extract light from LGP such that at least some of the light rays exit from the LGP towards the reflector positioned below the LGP.

## COUNT V

## DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. RE49630

55.    On March 30, 2021, Reissued United States Patent No. RE49,630 entitled

"Collimating Illumination Systems Employing a Waveguide" was duly and legally issued after

full and fair examination.  SVVTI is the owner of all right, title, and interest in and to the patent

by assignment, with full right to bring suit to enforce the patent, including the right to recover for

past infringement damages and the right to recover future royalties, damages, and income.  A

true copy of the '630 patent is incorporated by reference herein and may be accessed at

https://patents.google.com/patent/USRE49630E1.

56.    The following products are accused of infringing the '630 Patent (the "'630

Accused Products"):

    Acer SB272 Ebi.

In addition, the '630 Accused Products shall include those products identified in SVVTI's

infringement contentions, to be served in accordance with the case scheduling order.

57.    Defendant has directly infringed, and continues to directly infringe, literally or

under the doctrine of equivalents, at least claims 17 - 25 of the '630 patent by importing into the

United States, making, using, selling, and/or offering for sale, at least, the '630 Accused

Products, in the United States, in violation of 35 U.S.C. § 271(a).

58.    Alternatively, and in addition, Defendant directly infringes as described in the

preceding paragraph, by making and selling the '630 Accused Products outside of the United

States, delivers those products to its customers, distributors, and/or subsidiaries in the United

States, or in the case that it delivers the '630 Accused Products outside of the United States it

does so intending and/or knowing that those products are destined for the United States and/or

designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Defendant directly infringes through its direct involvement in the activities of its distributors or subsidiaries, including by selling and offering for sale the '630 Accused Products directly to is distributors or subsidiaries and importing the '630 Accused Products into the United States. Upon information and belief, Defendant conducts activities that constitutes direct infringement. Defendant is vicariously liable for this infringing conduct of its distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

59.     In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '630 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '630 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers, customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '630 Accused Products, creating established distribution channels for the '630 Accused Products into and within the United States, manufacturing the '630 Accused Products in conformity with

U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

60.    The '630 Accused Products comprise an illumination system, specifically, an LCD display. The display incorporates a liquid crystal display (LCD) which is backlit using a backlighting panel assembly (backlight). The backlight uses multiple light-emitting diodes (LEDs) which are placed along an edge of the visible area of the display and provide a light source. Light emitted by the LEDs is redistributed within the backlight using an optical waveguide which is the light guide plate (LGP).  The illumination system (display) comprises a planar optical waveguide formed from an optically transmissive dielectric material and having a first major surface, an opposing second major surface extending parallel to said first major surface, a first edge configured for light input, and an opposing second edge extending parallel to the first edge. For example, the backlight assembly incorporates a planar optical waveguide (LGP) which is an optically transmissive plate made of an optically transmissive dielectric material. Further, the LGP has the shape of a rectangular sheet with front and back surfaces (i.e., the first major surface and the second major surface) and four edges. The first edge is the light input edge where the LGP receives light, and the second edge is opposite to the first edge.  The display includes a plurality of linear cylindrical lenses formed in the first major surface and oriented perpendicular to the first and second edges. For example, the backlight assembly includes a plurality of linear cylindrical lenses that are disposed on the front surface of the LGP, and are perpendicular to the first and second edges.  The display incorporates a plurality of light emitting diodes (LEDs) which are positioned proximate to the first edge and optically coupled to the planar optical waveguide. For example, the backlight assembly includes a plurality of LEDs

that are positioned in proximity to the light input edge of the LGP and optically coupled to the LGP.  The display incorporates a reflective surface approximately coextensive with the planar optical waveguide and facing said second major surface. For example, the backlight assembly includes a reflector sheet that is positioned below the back surface of the LGP, and which faces the LGP's back surface.  The display incorporates a two-dimensional pattern of light extraction elements formed in or on said second major surface. For example, the back surface of the LGP includes a two-dimensional pattern of microstructures (or light extraction elements) which are distributed over both length and width dimensions of the back surface and are used to extract the light from LGP.  Each of the plurality of linear cylindrical lenses is configured to reflect light using a total internal reflection. For example, the LGP receives light from LEDs on its light input edge and propagates it towards the second edge using optical transmission and total internal reflection (TIR) from its front surface comprising the linear cylindrical lenses.  The area of each of said light extraction elements is less than an area of each of said plurality of linear cylindrical lenses. The area of each light extraction element (microstructure) is less than one tenth of a millimeter. The area of each elongated cylindrical lens is at least several square millimeters or more. Thus, the area of each of said light extraction elements is less than an area of each of said plurality of linear cylindrical lenses.  A spacing distance between individual ones of said light extraction elements within the two-dimensional pattern generally decreases with a distance from the first edge. For example, the spacing between the light extraction elements is more at the first edge (i.e., at the light input edge) than the second edge of the LGP.  Each of the plurality of linear cylindrical lenses has a curved surface portion with an arcuate cross-sectional profile.  A thickness of said planar optical waveguide (LGP) is greater than EFL+R, where EFL is an effective focal length of the respective linear cylindrical lens and R is a radius of curvature of the

arcuate cross-sectional profile.  The LGP has a thickness of 2 mm. Further, the radius of curvature ("R") of each individual lens is 118 µm. It is known that for a lens array, EFL = R/(n-1), where n is the refractive index of the lens array. The refractive index "n" of the lens array of the LGP is known to be ~1.5.  Therefore, EFL = 118 µm / (1.5-1), which is 236 µm. Since 2 mm is substantially greater than 236 µm + 118 µm (which is 354 µm or 0.354 mm), it is apparent that the thickness of the planar optical waveguide (LGP) is greater than EFL+R.

## FURTHER ASSERTIONS INVOLVING ALL CLAIMS

61.     The Asserted Patents are valid and enforceable.

62.     Defendant has been aware of the '318 Patent, '088 Patent, '562 Patent, and '135 Patent since, at least, January 29, 2021, when Acer received a letter from SVVTI, dated January 22, 2021, introducing SVVTI, and notifying Acer of those patents, and identifying several of Acer's products that utilize SVVTI's intellectual property.  In particular, the January 22, 2021 letter identified United States Patent Nos. 8,290,318; 8,740,397; 9,678,321; 9,097,826; 9,256,007; 9,880,342; 10,269,999; 10,439,088; 10,439,089; 10,613,306; 10,627,562; 10,797,191; 10,838,135; and 10,868,205.

63.     Defendant has been aware of the '318 Patent, '088 Patent, '562 Patent, and '135 Patent since, at least, June 21, 2021 when SVVTI filed three patent infringement lawsuits against Acer, styled *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-639-ADA (W.D. Tex.), *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-640-ADA (W.D. Tex.), and *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-641-ADA (W.D. Tex.).  Those cases collectively accused Acer of infringement involving the '318 Patent, '088 Patent, '562 Patent, and '135 Patent.

64.     Alternatively, Defendant has had knowledge of the Asserted Patents since, at least, the filing date of the original complaint in this action.

65.     Defendant's affirmative acts of selling the Accused Products, causing the Accused Products to be sold, advertised, offered for sale, and/or distributed, and providing instruction manuals for the Accused Products have induced and continue to induce Defendant's customers, and/or end-users to use the Accused Products in their normal and customary way to infringe the Asserted Patents.  For example, it can be reasonably inferred that end-users will use the infringing products, which will cause the end-users to use the elements that are the subject of the claimed invention.  Defendant specifically intended and was aware that these normal and customary activities would infringe the Asserted Patents.  In addition, Defendant provides marketing and/or instructional materials, such as user guides, that specifically teach end-users to use the Accused Products in an infringing manner.  By providing such instructions, Defendant knows (and has known), or was willfully blind to the probability that its actions have, and continue to, actively induce infringement.  By way of example only, Defendant has induced infringement and continue to induce infringement of, in addition to other claims, at least the specific claims identified above of the Asserted Patents by selling in the United States, without SVVTI's authority, infringing products and providing instructional materials.  These actions have induced and continue to induce the direct infringement of the Asserted Patents by end-users.  Defendant performed acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the Asserted Patents and with the knowledge, or willful blindness to the probability, that the induced acts would constitute infringement.  Upon information and belief, Defendant specifically intended (and intends) that its actions would result in infringement of at least the specific claims identified above of the Asserted Patents, or

subjectively believed that its actions would result in infringement of the Asserted Patents but took deliberate actions to avoid learning of those facts, as set forth above. Upon information and belief, Defendant knew of the Asserted Patents and knew of its infringement, including by way of this lawsuit as described above.

66.    Defendant's infringement has been and continues to be willful and deliberate. Upon information and belief, Defendant deliberately infringed the Asserted Patents and acted recklessly and in disregard to the Asserted Patents by making, having made, using, importing, and offering for sale products that infringe the Asserted Patents. Upon information and belief, the risks of infringement were known to Defendant and/or were so obvious under the circumstances that the infringement risks should have been known. Upon information and belief, Defendant has no reasonable non-infringement theories. Upon information and belief, Defendant has not attempted any design/sourcing change to avoid infringement. Defendant has acted despite an objectively high likelihood that its actions constituted infringement of the Asserted Patents. In addition, this objectively-defined risk was known or should have been known to Defendant. Upon information and belief, Defendant has willfully infringed and/or continues to willfully infringe the Asserted Patents. Defendant exhibited egregious behavior beyond typical infringement in that, despite being aware of its infringement, defendant did not develop any non-infringement theories, did not attempt any design or sourcing change, and did not otherwise cease its infringement.

67.    To the extent any marking or notice was required by 35 U.S.C. § 287, Plaintiff has complied with the applicable marking and/or notice requirements of 35 U.S.C. § 287.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury for all issues so triable.

## PRAYER

WHEREFORE, Plaintiff prays for judgment that:

1.      Defendant has infringed and continues to infringe, one or more claims of the Asserted Patents;

2.      Defendant be ordered to pay damages caused to Plaintiff by Defendant's unlawful acts of infringement;

3.      Defendant's acts of infringement have been, and are, willful;

4.      Plaintiff recover actual damages under 35 U.S.C. § 284;

5.      Plaintiff be awarded supplemental damages for any continuing post-verdict infringement up until final judgment;

6.      Plaintiff be awarded a compulsory ongoing royalty;

7.      Plaintiff be awarded an accounting of damages;

8.      Plaintiff be awarded enhanced damages for willful infringement as permitted under the law;

9.      A judgment and order requiring Defendant to pay to Plaintiff pre-judgment and post-judgment interest on the damages awarded, including an award of pre-judgment interest, pursuant to 35 U.S.C. § 284, from the date of each act of infringement by Defendant to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law;

10.     An award to Plaintiff of the costs of this action and its reasonable attorneys' fees pursuant to 35 U.S.C. §285; and

11.     Such other and further relied as the Court deems just and equitable.

DATED: October 10, 2024        Respectfully submitted,

/s/*Robert D. Katz*
Robert D. Katz
Texas Bar No. 24057936
KATZ PLLC
6060 N. Central Expressway, Suite 560
Dallas, TX 75206
214-865-8000
888-231-5775 (fax)
rkatz@katzfirm.com

**ATTORNEY FOR PLAINTIFF
SVV TECHNOLOGY INNOVATIONS INC.**